**Karen LECLERC, et al.**

v.

**Daniel A. WEBB, et al.**

**No. Civ.A. 03–664.**

United States District Court,
E.D. Louisiana.

July 2, 2003.

782

Louis Roy Koerner, Jr., Law Offices of Louis R. Koerner, New Orleans, LA, for Plaintiff.

Maureen D Affleck, New Orleans, LA, pro se.

Richard P. Ieyoub, Louisiana Department of Justice Attorney General's Office, Baton Rouge, LA, Harry Rosenberg, Bruce Victor Schewe, Christopher K. Ralston, Phelps Dunbar, LLP, New Orleans, LA, for Defendants.

### *ORDER AND REASONS*

ZAINEY, District Judge.

Before the Court are **Defendants' Motion to Dismiss (Rec.Doc. 18)** filed by Justices Jeffery P. Victory, Jeannette Theriot Knoll, Chet D. Traylor, Catherine D. "Kitty" Kimball, John L. Weimer, Bernette Joshua Johnson, in their official capacities as Justices of the Supreme Court of Louisiana, and Daniel A. Webb and Harry J. Philips, Jr., in their official capacities as Chairman and Vice–Chairman of

the Louisiana Committee on Bar Admissions, **Plaintiffs' Appeal of the Order of the Magistrate Judge Granting a Protective Order and Staying All Discovery (Rec.Doc. 25) and Plaintiffs' Motion for Summary Judgment (Rec.Doc. 12)** filed by Karen Leclerc, Guillaume Jarry, Béatrice Boulord, and Maureen Affleck.

Plaintiffs are non-immigrant aliens [1] residing in the United States pursuant to temporary visas. Plaintiffs have brought this suit challenging Louisiana Supreme Court Rule XVII, Section 3(B) which requires that every applicant to the Louisiana bar be a citizen or resident alien of the United States. They allege that Rule XVII, as currently interpreted by the Louisiana Supreme Court, is unconstitutional and/or preempted by federal law. Plaintiffs seek declaratory and injunctive relief as well as an award of costs and attorney's fees. Defendants have moved to dismiss all claims arguing *inter alia* that the suit is barred by the Eleventh Amendment as well as the doctrines of judicial and legislative immunity. Defendants also argue that Plaintiffs fail to state a claim for relief under federal law.

## I. *Factual Background*

Plaintiffs currently reside in the United States under temporary visas which provide a date certain when they must leave the United States. Leclerc, Jarry, and Boulord are French citizens admitted to the United States pursuant to J–1 visas. Affleck is a Canadian citizen admitted to the United States pursuant to an L–2 visa. All plaintiffs are graduates of foreign law schools. Plaintiffs desire to submit applications to sit for the July 2003 bar examination and believe themselves to be qualified but for their status as non-resident aliens.[2]

Affleck applied for an equivalency determination pursuant to Rule XVII, Section 6.[3] On November 15, 2002, the Bar Admissions administrator informed Affleck that an equivalency determination would not be forthcoming because Affleck was neither a U.S. citizen nor resident alien. Rec. Doc. 8, Exhibit 9. Affleck did not petition the Louisiana Supreme Court for a review of that denial pursuant to Section 9 of Rule XVII.[4] When this suit was filed, Leclerc,

---

**1.** The terms non-resident alien and non-immigrant alien are used interchangeably throughout this opinion. Likewise, the terms resident alien and immigrant alien are also used interchangeably.

**2.** Supreme Court Rule XVII Section 3(B) requires that every applicant for admission to the Louisiana Bar "[b]e a citizen of the United States or a *resident alien* thereof." La. S.Ct. R. XVII, § 3(B) (emphasis added). The Louisiana Supreme Court had previously interpreted the term "resident alien" to include foreign nationals lawfully living within the United States. *See, e.g., In re Appert,* 444 So.2d 1208 (La.1984), *overruled by In re Bourke,* 819 So.2d 1020 (La.2002). However, in 2002, the court held that the term "resident alien" applies to aliens who have been granted permanent resident status in the United States as opposed to those who are merely residing in the country on a temporary basis. *Bourke,* 819 So.2d at 1022. The court ex-

pressly overruled any prior decisions to the contrary. *Id.*

**3.** Louisiana's bar admission rules provide:

An applicant who has graduated from a law school that is not located in the United States or its territories must submit an application to the Committee for an equivalency determination. Such application shall be in addition to all other applications required by this rule.

La. S.Ct. R. XVII, § 6(A).

**4.** The pertinent text of Section 9 of Rule XVII is located at note 7 *infra.*

Jarry did attempt to petition the Louisiana Supreme Court for permission to take the bar exam. However, he did so without completing any of the requisite steps to apply for admission through the Committee. The Court therefore rejected his petition as pre-

Jarry, and Boulord had not yet applied for equivalency determinations.[5] Although untimely under the Louisiana rules, Leclerc, Jarry, and Boulord submitted equivalency applications after Defendants argued (in their motion to dismiss) that Plaintiffs lacked standing to bring this suit.[6]

On March 6, 2003, Plaintiffs Leclerc, Jarry, and Boulord filed their original complaint seeking declaratory relief and injunctive relief against Defendants as well as costs and attorney's fees. Plaintiffs named as defendants six of the seven Louisiana Supreme Court Justices—Jeffery P. Victory, Jeannette Theriot Knoll, Chet D. Traylor, Catherine D. "Kitty" Kimball, John L. Weimer, and Bernette Joshua Johnson ("the Justices"), Daniel A. Webb, Chairman of the Louisiana Committee on Bar Admissions, and Harry J. Philips, Jr., Vice–Chairman of the Louisiana Committee on Bar Admissions ("the Bar Admissions Officials") (collectively "Defendants"). All Defendants were sued in their official capacities only.

The Court held a status conference on March 20, 2003, and set deadlines for briefing on cross motions for summary judgment: Rec. Doc. 7. Plaintiff Affleck joined this suit via amended complaint on March 27, 2003. Defendants moved to stay all discovery pending a determination on their immunity defenses and on May 1, 2003, the magistrate judge granted a stay. Rec. Doc. 17. Plaintiffs' appeal of that order is currently before the Court and is inextricably intertwined with the arguments raised in Defendants' motion to dismiss.

Pursuant to the Court's scheduling order, Plaintiffs filed their fully-briefed motion in support of declaratory relief[7] and Defendants filed their fully-briefed motion to dismiss. Both motions were set for hearing on May 21, 2003. On May 21, 2003, the Court held a status conference at Plaintiffs' request and at Plaintiffs' urging the motions were continued for hearing on June 4, 2003. The Court ordered supplemental briefing on Plaintiffs' immigration status, and on June 25, 2003, the Court heard oral argument.

In their motion for summary judgment Plaintiffs pray for a judgment:

1. Declaring the unconstitutionality of Section 3(B) of Rule XVII of the Rules of the Louisiana Supreme Court as interpreted by that Court to deny bar admission to "non-resident aliens";

2. Declaring that Section 3(B) of Rule XVII of the Rules of the Louisiana Supreme Court as interpreted by

---

mature. *In re Royot*, 834 So.2d 427 (La. 2003); Rec. doc. 1, Exhibit 3.

5. Leclerc, Jarry, and Boulord claim that they would have timely submitted equivalency applications but for the experiences of Nathalie Royot, Véronique Marty, and Céline Moguen. Royot, Marty, and Moguen received favorable equivalency determinations but their applications to sit for the bar were denied due to their residency status. Royot, Marty, and Moguen sought writs in the United States Supreme Court but their application was untimely. After this suit was filed and Defendants raised the case or controversy arguments, Leclerc, Jarry, and Boulord then filed applications for equivalency.

6. Louisiana's bar admission rules require that equivalency applications for those applicants wishing to take the July 2003 bar exam were due no later than December 1, 2002. La. S.Ct. R. XVII, § 6(A).

7. After Defendants questioned whether the Federal Courts Improvement Act of 1996, 110 Stat. 3847, 2853 (1996) (amending 42 U.S.C. § 1983), would permit injunctive relief against the state's judicial officers, Plaintiffs moved to amend their complaint to drop the request for injunctive relief. Rec. Doc. 27. The Court denied the motion to amend for reasons unrelated to the request for injunctive relief.

that Court is preempted by the plenary power of the Federal Government to set immigration policy;

3. Declaring that the Louisiana Supreme Court and the Louisiana Committee on Bar Admissions may not constitutionally deny plaintiffs the opportunity to sit for the Louisiana state bar examination solely on account of the fact that they are not citizens or resident aliens and to permit them to submit an application package, including that for equivalency determination if one has not already been submitted, so as to permit them to sit for the Louisiana state bar examination in July of 2003, provided that they meet all other requirements of Rule XVII, as reasonably interpreted;

4. Awarding Plaintiffs reasonable costs and attorney's fees under 42 U.S.C. § 1988.

Defendants assert that Plaintiffs fail to present a justiciable case or controversy because their claims are not ripe for adjudication and because Plaintiffs lack standing. Defendants further argue that Plaintiffs' claims are barred by the Eleventh Amendment and the doctrines of judicial immunity and/or legislative immunity. Finally, Defendants argue that Plaintiffs' complaint fails to state a claim upon which relief can be granted. Alternatively, Defendants urge the Court to abstain from this matter. The Court addresses each argument in turn.

## II. *Defendants' Motion to Dismiss*

### A. Legal Standards

A litigant may object to a court's lack of jurisdiction through a motion to dismiss under Rule 12(b)(1) of the Federal Rules of Civil Procedure. Jurisdictional defects include immunity of the defendants in an action and the court's consequent lack of subject matter jurisdiction. *Bank One*

*Texas v. United States,* 157 F.3d 397, 403 & n. 12 (5th Cir.1998). Under Rule 12(b)(6) a court must dismiss a complaint that fails to state a claim upon which relief can be granted. When considering a Rule 12(b)(6) motion to dismiss, the court views all material allegations in plaintiff's complaint as true. *See In re Mastercard Int'l, Inc.,* 313 F.3d 257, 261 (5th Cir.2000). Conclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to defeat a motion to dismiss. *Id.*

### B. Case or Controversy

Defendants assert that Plaintiffs rest their claims on factual assumptions and conjecture that do not present a "case" or "controversy" under Article III of the United States Constitution. Thus, Defendants assert that Plaintiffs' claims are not ripe for adjudication and that Plaintiffs lack standing to pursue their asserted claims.

Defendants point out that Leclerc, Jarry and Boulord have taken none of the required steps in order to sit for the Louisiana bar exam. Thus, Leclerc, Jarry and Boulord have not been subject to any adverse action by Defendants on any basis including their alienage. Defendants point out that Leclerc, Jarry, and Boulord must obtain equivalency determinations for their foreign law school educations, and that an adverse determination on equivalency would moot any issue as to their residency status. Because Leclerc, Jarry, and Boulord have been subject to no adverse action, Defendants argue that they also lack standing to bring this suit because they seek redress for an injury that has not and may never occur.

 Defendants concede that Affleck submitted a timely application for an equivalency determination and that her application was not considered due to her status as a non-resident alien. However,

Defendants contend that Affleck also has a ripeness/standing problem because she did not avail herself of the review procedures provided in Supreme Court Rule XVII, Section 9.[8] Defendants contend that at the conclusion of that appeal process, which all Plaintiffs would be required to complete, the *Rooker-Feldman* doctrine would then have deprived this Court of jurisdiction to consider Plaintiffs' claims.[9]

Although she did not avail herself of the review procedures provided in the Supreme Court rules, Affleck asserts that federal law does not require exhaustion of state remedies prior to bringing a claim alleging violations of federal law. Moreover, she asserts that any appeal would have been futile anyway. Given then that the bar committee has cited Affleck's al-

ienage as the basis for refusing to consider her equivalency application, Affleck asserts that she has a justiciable claim.

Leclerc, Jarry, and Boulord argue that Affleck's situation demonstrates the futility of submitting an equivalency application, and therefore, excuses their failure to seek equivalency determinations.[10] Leclerc, Jarry, and Boulord argue that concrete injury is surely imminent.[11]

■ In reply, Defendants clarify that they are not arguing that any type of administrative exhaustion applies to Plaintiffs' constitutional claims.[12] Rather, Defendants argue that Plaintiffs must receive a definitive adverse action before they may complain of a constitutional violation. Until Plaintiffs pursue their applications through the review and appeal procedures

---

**8.** Rule XVII, Section 9, Denial of Eligibility; Appeals, provides:

> Upon notice to the applicant by the Committee that an applicant has failed to fulfill one or more of the requirements of Sections 3 or 5, or upon notice to the applicant from the Committee that the equivalency panel has found that applicant's legal education is not equivalent to that received by a graduate of a law school approved by the American Bar Association as required by Section 6, and that the Committee concurs in such finding, the applicant may appeal by petition directly to the Court.
>
> (B) Procedure in Supreme Court. The Court may, in its discretion, without taking further evidence, affirm or reverse the Committee's recommendation, remand to the Committee for further action as the Court instructs, or appoint a Commissioner to take evidence.
>
> La. S.Ct. R. XVII, § 9.

**9.** The *Rooker-Feldman* doctrine directs that federal district courts lack jurisdiction to entertain collateral attacks on state court judgments. *Liedtke v. State Bar of Texas*, 18 F.3d 315, 317 (5th Cir.1994) (citing *Rooker v. Fidelity Trust Co.*, 263 U.S. 413, 44 S.Ct. 149, 68 L.Ed. 362 (1923); *District of Columbia Court of Appeals v. Feldman*, 460 U.S. 462, 103 S.Ct. 1303, 75 L.Ed.2d 206 (1983)). Constitutional questions arising in state proceedings are to

be resolved by the state courts. *Id.* Any alleged constitutional error in the state court judgment is to be reviewed and corrected by the appropriate state appellate court. *Id.* Thereafter, recourse at the federal level is limited solely to an application for a writ of certiorari to the United States Supreme Court. *Id.* The casting of a complaint in the form of a civil rights action cannot circumvent this rule, as absent a specific delegation "federal district court[s], as court[s] of original jurisdiction, lack[ ] appellate jurisdiction to review, modify, or nullify final order[s] of state court[s]." *Id.* (quoting *Kimball v. Florida Bar*, 632 F.2d 1283, 1284 (5th Cir.1980)).

**10.** As discussed at note 3 *supra*, Jarry submitted a procedurally improper petition to the Louisiana Supreme Court.

**11.** Plaintiffs' counsel informed the Court at the April 17, 2003, status conference that Leclerc, Jarry, and Boulord had submitted equivalency applications after they filed suit.

**12.** Indeed, it is well-established that administrative exhaustion does not apply to civil rights claims unless specifically mandated by Congress. *Porter v. Nussle*, 534 U.S. 516, 523, 122 S.Ct. 983, 987, 152 L.Ed.2d 12 (2002); *Turner v. Houma Municipal Fire*, 2002 WL 1467876 (E.D.La. Jul.8, 2002).

provided for in the Louisiana Supreme Court rules, no plaintiff has received a definitive adverse action for purposes of standing and ripeness.

Article III of the United States Constitution limits federal courts to the decision of "cases" and "controversies." *Shields v. Norton,* 289 F.3d 832, 834–35 (5th Cir. 2002). Ripeness and standing are two "justiciabilty doctrines" developed by federal courts to give meaning to the case or controversy requirement. *United Transportation Union v. Foster,* 205 F.3d 851, 857 (5th Cir.2000). Thus, ripeness and standing are both constitutional prerequisites to the exercise of jurisdiction.

### Ripeness

■ A matter is ripe only where an "actual controversy" exists. *Shields,* 289 F.3d at 835 (citing 28 U.S.C. § 2201(a)). Ripeness separates those matters that are premature because the injury is speculative and may never occur from those that are appropriate for judicial review. *United Transportation,* 205 F.3d at 857 (citing *Abbott Labs. v. Gardner,* 387 U.S. 136, 148–49, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967), *overruled on other grounds, Califano v. Sanders,* 430 U.S. 99, 97 S.Ct. 980, 51 L.Ed.2d 192 (1977)). A case is generally ripe if any remaining questions are purely legal ones. *Id.* (quoting *New Orleans Pub. Serv., Inc. v. Council of New Orleans,* 833 F.2d 583, 586–87 (5th Cir.1987).). Conversely, a case is not ripe if further factual development is required. *Id.* When challenging a statute or rule, ripeness may require that the rule be evaluated in light of a particular situation rather than a hypothetical one. *See Texas v. United States,* 523 U.S. 296, 301, 118 S.Ct. 1257, 1260, 140 L.Ed.2d 406 (1998).

■ The Court is not persuaded that Plaintiffs' claims are not ripe for adjudication. Both parties agree that no further factual development is necessary in this litigation. The only issues now before the Court are strictly legal ones. Clearly, an actual controversy exists between the parties.

Further, this case does not involve the speculative and hypothetical type of injury at issue in those cases where plaintiff's challenge to a statute has been rejected as premature. For instance Defendants cite *National Park Hospitality Association v. Department of the Interior,* — U.S. —, 123 S.Ct. 2026, 155 L.Ed.2d 1017 (2003), in support of their ripeness argument. In *National Park,* plaintiffs made a facial challenge to a federal law whose scope was unclear. Plaintiffs argued that the uncertainty as to the statute's application was causing them injury in that they could not adequately prepare bids for certain government contracts. The Court rejected that contention and concluded that judicial resolution of the statute's application should await a concrete dispute about a particular contract. 123 S.Ct. at 2032–33.

In contrast, the Louisiana Supreme Court has already applied Rule XVII in at least one particular instance in this litigation, *i.e.,* Affleck's application. Her application for equivalency was denied solely due to her residency status. Based on the Louisiana Supreme Court's decisions in *In re Bourke,* 819 So.2d 1020 (La.2002), and *In re Schnyder,* 824 So.2d 1135 (La.2002), as well as the experiences of Royot, Marty, and Moguen, there is no reason to think that the Supreme Court would have granted Affleck relief had she pursued the appeal process. Likewise, there is no reason to believe that Leclerc, Jarry, and Boulord would have been any more successful than Affleck, Bourke, and Schnyder. Accordingly, Plaintiffs' claims are ripe for adjudication.

### Standing

■ To satisfy the standing requirement, the plaintiff must have suffered an injury in fact. *Southern Christian Leadership Conf. v. Supreme Court of the State*

*of Louisiana,* 252 F.3d 781, 787 (5th Cir. 2001). An "injury in fact" is an invasion of a legally protected interest which is both (a) concrete and particularized, and (b) actual or imminent and not conjectural or hypothetical.[13] *Id.* (citing *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 112 S.Ct. 2130, 2136, 119 L.Ed.2d 351 (1992)). Plaintiff cannot establish standing by relying on an undifferentiated interest in the proper application of the law. *Sierra Club v. Glickman,* 156 F.3d 606, 613 (5th Cir. 1998).

■ To establish standing to challenge an allegedly unconstitutional policy, as a general matter "a plaintiff must submit to the challenged policy." *Ellison v. Connor,* 153 F.3d 247, 254–55, (5th Cir.1998) (quoting *Jackson–Bey v. Hanslmaier,* 115 F.3d 1091, 1096 (2d Cir.1997)). In other words, a plaintiff "may not seek redress for injuries done to others." *Id.* (quoting *Moose Lodge No. 107 v. Irvis,* 407 U.S. 163, 166, 92 S.Ct. 1965, 32 L.Ed.2d 627 (1973)). However, in the Fifth Circuit, this threshold requirement for standing may be excused where the plaintiff makes a "substantial showing that application for the benefit ... would have been futile." *Id.* (citing *Jackson–Bey,* 115 F.3d at 1096).

In *Ellison,* the Fifth Circuit applied this "futility exception" to plaintiff landowners who sought to challenge the constitutionality of a Corps of Engineers permitting decision. Defendants argued that plaintiffs lacked standing because they had not actually applied for, and been refused, a permit. However, the Corps had previously advised plaintiffs via letter that it would not allow construction on plaintiffs' land. The Fifth Circuit reversed the dis-

trict court's finding of no standing. 153 F.3d at 254–55. The court concluded that it would be futile to require the plaintiffs to ask the Corps for a permit when the Corps had already made a determination that no permit would issue. *Id.* at 255.

■ Based on the foregoing, the Court has no doubt that Affleck has standing to challenge Rule XVII. The Bar Committee informed Affleck that her equivalency application would not be considered due to her residency status. She therefore suffered a concrete injury as a result of Rule XVII. Based upon the prior decisions of the Louisiana Supreme Court denying the petitions of other non-immigrant aliens the Court concludes that any petition to the Louisiana Supreme Court would have been futile.

Leclerc, Jarry, and Boulord present a far more difficult question because they took no steps in furtherance of submitting an application to sit for the bar exam prior to filing this lawsuit. Although they submitted equivalency applications *after* they filed this lawsuit, those applications appear to be untimely and therefore may be rejected by Defendants on grounds wholly unrelated to their residency status. However, without a doubt Defendants will eventually reject Leclerc, Jarry, and Boulord's applications due to their residency status given the Supreme Court's unequivocal position on the issue. The fact that Leclerc, Jarry, and Boulord will suffer injury due to Rule XVII is not conjectural or hypothetical. It just has yet to happen. Because their injury is certain to occur and imminent, the Court concludes that they too have standing to challenge Rule XVII.[14]

---

**13.** The injury must also be traceable to the defendant, and the injury must be redressible. *Southern Christian Leadership Conf. v. Supreme Court of the State of Louisiana,* 252 F.3d at 787. Those aspects of standing are not at issue in this case.

**14.** The Court's resolution of the standing issue naturally has no relevance whatsoever as to whether Defendants will ultimately grant Plaintiffs' equivalency applications on the merits.

In sum, Defendants' motion to dismiss based on Plaintiffs' failure to establish a case or controversy is DENIED.

## C. Eleventh Amendment Immunity

Defendants argue that the Eleventh Amendment bars Plaintiffs' claims. Because all defendants are state officials sued in their official capacities, the state is the real party in interest. Therefore, Defendants argue, the Eleventh Amendment bars suit regardless of the relief sought.

Plaintiffs do not dispute that the Eleventh Amendment applies to the Justices as well as to the Bar Admissions Officials. Plaintiffs assert, however, that sovereign immunity does not bar the prospective declaratory relief Plaintiffs seek. Plaintiffs argue that any assertion that the Eleventh Amendment bars suit regardless of the type of relief sought is contrary to established United States Supreme Court jurisprudence.

The Eleventh Amendment provides:

The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State.

U.S. Const. amend. XI.

■■■ The Eleventh Amendment generally divests federal courts of jurisdiction to entertain suits directed against states. *Green v. State Bar of Texas,* 27 F.3d 1083, 1087 (5th Cir.1994) (citing *Port Auth. Trans–Hudson Corp. v. Feeney,* 495 U.S. 299, 304, 110 S.Ct. 1868, 1871, 109 L.Ed.2d 264 (1990)). Although by its terms the Amendment applies only to suits against a state by citizens of another state, the Supreme Court interprets the Amendment as barring suits in federal court by citizens against their own states as well. *See Cox v. City of Dallas,* 256 F.3d 281, 307 (5th Cir.2001) (citing *Board of Trustees v. Gar-*

*rett,* 531 U.S. 356, 121 S.Ct. 955, 962, 148 L.Ed.2d 866 (2001)).

The Eleventh Amendment may not be evaded by suing state officers in their official capacities because such an indirect pleading device remains in essence a claim against the state. *Id.* (citing *Stem v. Ahearn,* 908 F.2d 1, 3 (5th Cir.1990)). Eleventh Amendment relief is available to both the Louisiana Supreme Court and the Louisiana State Bar Association. *Southern Christian Leadership v. Supreme Court of State of Louisiana,* 61 F.Supp.2d 499, 505 (E.D.La.1999) (citing *Lewis v. Louisiana State Bar Ass'n,* 792 F.2d 493, 497 (5th Cir.1986)).

■■■ However, where state officials are sued in their official capacities, the doctrine of *Ex parte Young* may operate as an exception to the Eleventh Amendment. *Cox,* 256 F.3d at 307 (citing *Ex parte Young,* 209 U.S. 123, 159–60, 28 S.Ct. 441, 52 L.Ed. 714 (1908)). Under *Ex parte Young,* the Eleventh Amendment does not bar a suit against a state official alleged to be acting in violation of federal law. *Id.* The *Ex parte Young* doctrine is grounded on the concept that the state cannot authorize its officials to violate the Constitution and laws of the United States. *Id.* (citing *Ex parte Young,* 209 U.S. at 160, 28 S.Ct. 441, 52 L.Ed. 714). *Ex parte Young* only permits an award of declaratory or prospective injunctive relief, *i.e.,* to enjoin the future enforcement of an unconstitutional rule, regulation, or law. *See id.; Thiel v. State Bar of Wisconsin,* 94 F.3d 399, 400 (7th Cir.1996). Retrospective relief in the form of a money judgment in compensation for past wrongs—no matter how small—is barred. *Brennan v. Stewart,* 834 F.2d 1248, 1252 (5th Cir.1988). The *Ex parte Young* exception does not apply to state law claims. *See Pennhurst v. Halderman,* 465 U.S. 89, 105, 104 S.Ct. 900, 911, 79 L.Ed.2d 67 (1984) (noting that

*Ex parte Young* is inapplicable where violations of state law are at issue).

In this case Plaintiffs' *federal* claims fall squarely within the *Ex parte Young* exception to Eleventh Amendment immunity. Plaintiffs have sued all defendants in their official capacities and seek only declaratory and prospective injunctive relief. Plaintiffs are not seeking monetary compensation for past wrongs. Therefore, Defendants are not entitled to dismissal of Plaintiffs' federal claims based upon Eleventh Amendment immunity. However, to the extent Plaintiffs are attempting to assert any type of state law, claim, those state law claims are dismissed for lack of subject matter jurisdiction.[15]

In sum, Defendants' motion to dismiss based on Eleventh Amendment immunity is GRANTED IN PART AND DENIED IN PART. The motion is GRANTED insofar as Plaintiffs are attempting to assert state law claims. The motion is DENIED as to Plaintiffs' federal claims.

### D. Absolute Immunity

#### 1. Judicial Immunity

Defendants argue that judges are absolutely immune from suits based upon actions taken in their official *judicial* capacities. Further, Defendants point out that Congress enlarged judicial immunity via the Federal Courts Improvement Act of 1996 ("the FCIA") which specifically amended 42 U.S.C. § 1983.

Plaintiffs dispute whether the actions complained of were taken in Defendants' *judicial* capacities. Plaintiffs point out that their claims arise out of the way

Defendants are enforcing an allegedly unconstitutional rule and therefore Defendants' actions have been taken in their enforcement capacities. Plaintiffs assert that the FCIA was not intended to erase the distinction previously made between actions taken in a judicial officer's *judicial* capacity versus those taken in *enforcement* and *administrative* capacities. Plaintiffs also assert that judicial immunity does not apply to the *declaratory* relief Plaintiffs seek.

Plaintiffs distinguish their case from those upholding judicial immunity by pointing out that their case is one questioning the constitutionality of a bar admissions rule generally as opposed to an aggrieved individual. Plaintiffs remind the Court that their challenge to Rule XVII is a facial one so that they are not challenging the adjudication of an individual application, *i.e.*, action taken in the officer's judicial capacity. As such, Plaintiffs argue that their claims are not barred by judicial immunity.

Three United States Supreme Court cases form an appropriate starting point for consideration of Defendants' judicial immunity defense. In *Supreme Court of Virginia v. Consumers Union*, 446 U.S. 719, 736, 100 S.Ct. 1967, 1977, 64 L.Ed.2d 641 (1980), the Supreme Court held that judicial immunity did not bar injunctive relief against the Virginia Supreme Court and its chief justice. Plaintiffs brought a facial challenge to an allegedly unconstitutional bar rule and sought to enjoin defendants from prospectively enforcing it against attorneys. In upholding the in-

---

**15.** Without citation of authority or explanation, Defendants concede that Plaintiffs Fourteenth Amendment claims are not barred by the Eleventh Amendment. Defendants' Motion to Dismiss at 13 n. 6. For the reasons explained above, Defendants are correct. However, Fourteenth Amendment claims generally are subject to the Eleventh Amendment

except where Congress expressly abrogates the state's immunity when legislating pursuant to its enforcement powers under the Fourteenth Amendment. *See Kimel v. Florida Bd. of Regents*, 528 U.S. 62, 72, 120 S.Ct. 631, 640, 145 L.Ed.2d 522 (2000); *Santiago v. New York Dep't of Correct. Servs.*, 945 F.2d 25, 28 (2d Cir.1991).

junction, the Court distinguished between the various capacities in which the state's supreme court was authorized to act under state law. Thus, in conjunction with administering bar matters, the state's highest court engages in adjudicative duties (determining moral fitness of attorney applicants), legislative or rule-making duties (promulgating bar admission rules and procedures), and enforcement duties (applying the bar rules against attorneys or bar applicants), but judicial immunity would not *per se* apply to the latter two functions. In *Consumers Union,* the Court held that plaintiffs were entitled to declaratory and injunctive relief without regard to the defendants' status as judicial officers because the lawsuit arose out of their role as "enforcers" of the bar rules. Thus, like any state official who enforces laws, injunctive and declaratory relief were available notwithstanding that defendants were judicial officers. *Id.*

Four years later, in *Pulliam v. Allen,* 466 U.S. 522, 541–42, 104 S.Ct. 1970, 1981, 80 L.Ed.2d 565 (1984), the Supreme Court held that judicial immunity did not prohibit declaratory and injunctive relief against a judicial officer acting in his or her *judicial* capacity. In *Pulliam,* plaintiff had challenged the constitutionality of a state judge's practice of incarcerating persons awaiting trial for nonincarcerable offenses—acts clearly taken in defendant's judicial capacity. Thus, in the wake of *Consumers Union* and *Pulliam,* judicial immunity did not apply to acts taken by judicial officers in their *enforcement* capacities and was not a bar to declaratory and injunctive relief for acts taken in the judge's *judicial* capacity.

Finally, in *Forrester v. White,* 484 U.S. 219, 108 S.Ct. 538, 98 L.Ed.2d 555 (1988),

the Court again recognized the importance of properly categorizing a judicial officer's acts for purposes of determining whether judicial immunity applies. In that case the Court found judicial immunity inapplicable where a state judge had been sued for sexual discrimination in employment-related matters. *Id.* at 229, 108 S.Ct. at 545. The Court noted that there is no immunity for "acts that simply happen to have been done by judges" when those acts are not judicial acts. *Id.* at 227, 108 S.Ct. at 544. Rather, the "immunity is justified and defined by the *functions* it protects and serves, not by the person to whom it attaches." *Id.* Although the Supreme Court had never articulated a precise and general definition of the class of acts entitled to immunity, the Court recognized the "intelligible distinction between judicial acts and the administrative, legislative, or executive functions that judges may on occasion be assigned by law to perform." *Id.* at 227, 108 S.Ct. at 544.

*Consumers Union, Pulliam,* and *Forrester* demonstrate that the question of judicial immunity in any given situation can only be answered with reference to the relief sought and the *capacity* in which the judge had acted. It is also clear that the Supreme Court in crafting judicial immunity over the years did not consider every act taken by a judge to be in his judicial capacity merely by virtue of the officer's status as a judge.

If *Consumer's Union, Pulliam,* and *Forrester* remain good law then Defendants' judicial immunity argument is without merit.[16] However, in 1996 Congress enacted the Federal Courts Improvement Act of 1996 which amended 42 U.S.C. § 1983 to provide that "in any action

**16.** *Consumer's Union* is not inapplicable merely because that case dealt with provisions of the Virginia bar's code of ethics. *Consumer's Union* is applicable because it dealt with a facial challenge to the code of ethics rather than the application of the code of ethics to an individual attorney in disciplinary proceedings.

brought against a judicial officer for an act or omission taken in such officer's *judicial* capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable." Pub.L. No. 104–317, 110 Stat. 3847 (Oct. 19, 1996) (emphasis added). The Senate report indicates that the amendment "restores the doctrine of judicial immunity to the status it occupied prior to [*Pulliam* ]" because *Pulliam* had departed from "400 years of common law tradition and weakened judicial immunity protections." S. Rep. 104–366, at *36–*37, 1996 U.S.C.C.A.N. 4202, 4216–17.

Defendants can make no colorable argument that the FCIA did anything to alter the landscape with respect to declaratory relief. Declaratory relief against judges acting in their judicial capacities was well-established before the FCIA. The FCIA amendments continue to contemplate declaratory relief by making express reference to it as a first step before injunctive relief is permissible. Moreover, the FCIA does not purport to eliminate the clear distinctions among the various capacities in which judicial officers act. The Supreme Court's jurisprudence had long been unequivocal in that the Court did not consider every act taken by a judicial officer to be a "judicial act" subject to judicial immunity. Therefore, Congress's decision to preclude injunctive relief when the judge acts specifically in his "judicial capacity" can only mean that injunctive relief remains available when the judicial officer acts in other capacities. This Court cannot make law. Had Congress intended for the amendment to apply regardless of which capacity the judge was acting, Congress would have said so. Likewise, had Congress intended to erase the long accepted capacity distinctions recognized by

the High Court it would have used appropriate language.[17] Instead, Congress specifically refers to acts taken in the *judicial* capacity. The Court is persuaded that the FCIA does not bar injunctive relief where a judicial officer acts in other capacities such as the enforcement capacity.

Defendants have argued strenuously that the FCIA protects them from injunctive relief because the acts of which Plaintiffs complain were performed in Defendants' *judicial* capacities. The Court is not so persuaded given the unique role that the Louisiana Supreme Court occupies under the state constitution and given that Plaintiffs are making a facial challenge to Supreme Court Rule XVII.

■■■ The Louisiana Constitution gives Defendants the exclusive and plenary power to define and regulate all facets of the practice of law, including the admission of attorneys to the bar, the professional responsibility and conduct of lawyers, the discipline, suspension and disbarment of lawyers, and the client-attorney relationship. *Succession of Wallace,* 574 So.2d 348, 350 (La.1991) (citing *LSBA v. Edwins,* 540 So.2d 294 (La.1989); *Saucier v. Hayes Dairy Products, Inc.,* 373 So.2d 102, 109, 115 (La.1979); *LSBA v. Connolly,* 201 La. 342, 9 So.2d 582 (1942); *Ex Parte Steckler,* 179 La. 410, 154 So. 41 (1934); *Meunier v. Bernich,* 170 So. 567 (La.App.1936)). Consequently, the Louisiana Legislature cannot enact laws defining or regulating the practice of law in any aspect without Defendants' consent. *Id.* (citing La. Const. 1974, Art. II). Nor is any officer of the executive branch charged with enforcing bar rules. Thus, in conjunction with attorney and bar matters, the Louisiana Supreme Court acts in the role of all three branches of government. It acts as a leg-

---

**17.** Interestingly, Defendants' own invocation of legislative immunity belies any assertion that they believe that the FCIA erased the

recognized distinctions between the various capacities in which judges act.

islative branch when promulgating rules, as a judicial branch when considering whether a particular applicant should be granted admission, and as an executive branch when it enforces or applies the very rules it makes. Clearly, had Plaintiffs been mounting a facial challenge to an unconstitutional statute passed by the legislature, the proper party defendant would be the executive branch state officer charged with enforcing that statute. In this case, due to the unique role of the Louisiana Supreme Court, Defendants are those state officers. In sum, for the facial challenge Plaintiffs bring today, Defendants are the proper party defendants because they are charged with enforcing the allegedly unconstitutional rule. Thus, for a suit mounting a facial challenge Defendants are by clear implication being sued in their enforcement capacities.

Moreover, this conclusion is not at odds with the well-established principle that admission to a jurisdiction's bar is "peculiarly a judicial function." *McFarland v. Folsom*, 854 F.Supp. 862, 874 (M.D.Ala.1994). Because Plaintiffs are mounting a facial challenge to Rule XVII and are not suing Defendants for any individual culpability in conjunction with Rule XVII, the "judicial function" aspects of judicial immunity are not at issue here. Thus, the Court concludes that Defendants are not entitled to judicial immunity for Plaintiffs' claims.[18]

In sum, Defendants' motion to dismiss based on judicial immunity is DENIED.

## 2. Legislative Immunity

Defendants assert that they are entitled to absolute legislative immunity from any suit related to bar admissions rule-making.

When the Justices and Bar Admissions Officials promulgate and implement bar admission rules they occupy the position of legislators.

In addition to Plaintiffs' arguments already recited regarding immunity, Plaintiffs assert that immunity does not extend to protect rules that are unconstitutional. Thus, regardless of the capacity in which Defendants are acting, a person's constitutional rights cannot be breached to prevent him/her from practicing law.

 When exercising its sovereign rule-making authority, a state supreme court occupies the same position as that of the state legislature. *Lewis v. Louisiana State Bar Ass'n*, 792 F.2d 493, 497 (5th Cir.1986) (citing *Bates v. State Bar of Arizona*, 433 U.S. 350, 97 S.Ct. 2691, 53 L.Ed.2d 810 (1977)). Like legislators, the members of the state's highest court are entitled to absolute legislative immunity in conjunction with promulgating bar admission rules. *Consumers Union*, 446 U.S. at 730–34, 100 S.Ct. at 1974–75. Thus, legislative immunity would foreclose any suit based upon the issuance of, or failure to amend, a challenged bar admission rule. *Id.* at 734, 100 S.Ct. at 1976. The same immunity applies to members of a state bar association whose role is "completely defined by the court." *Lewis*, 792 F.2d at 497 (quoting *Bates*, 433 U.S. at 361, 97 S.Ct. at 2697).

 Plaintiffs are making a facial challenge to the constitutionality of Rule XVII. They seek to enjoin its enforcement. None of their claims are directed at Defendants' role in having promulgated Rule XVII. Accordingly, legislative immunity is

---

**18.** *Pulliam* also held that Plaintiff could recover costs and attorney's fees in conjunction with obtaining injunctive relief against a judicial officer for acts taken in her judicial capacity. The FCIA amended 42 U.S.C. Section 1988(b) to reverse that aspect of *Pulliam*. Because the attorney's fees issue is wholly premature at this time, the Court expresses no opinion as to whether Plaintiffs could ultimately recover costs and attorney's fees in this action.

inapplicable. Defendants' motion to dismiss based on legislative immunity is DENIED.

## E. Abstention

Defendants argue that the Court should exercise its discretion to abstain from this matter pursuant to *Burford v. Sun Oil Co.,* 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943). Defendants point out that this matter involves questions of state law that are uniquely within the knowledge and expertise of the Louisiana Supreme Court. Therefore, the Louisiana Supreme Court, and not the federal judiciary, should oversee and administer Louisiana's bar admission rules.

In opposition, Plaintiffs argue that *Burford* abstention is inappropriate because no difficult questions of state law are involved in this case. Rather, Plaintiffs challenge Section 3(B) of Rule XVII on *inter alia* federal constitutional grounds. Thus, there is no justification for this Court to abdicate its jurisdiction.

■ While federal courts have a strict duty to exercise jurisdiction that is conferred upon them by Congress, the duty is not absolute. *Quackenbush v. Allstate Insurance Co.,* 517 U.S. 706, 716, 116 S.Ct. 1712, 135 L.Ed.2d 1 (1996). Keeping in mind that abstention is the exception and not the rule, federal courts may decline to exercise their jurisdiction in circumstances where denying a federal forum would clearly serve important countervailing interests such as considerations of proper constitutional adjudication, regard for federal-state relations, or wise judicial administration. *Id.* In exercising their discretion, federal courts must "fit within the narrow and specific limits prescribed by the particular abstention doctrine involved." *Webb v. B.C. Rogers Poultry Inc.,* 174 F.3d 697, 701 (5th Cir.1999) (quoting *Clark v. Fitzgibbons,* 105 F.3d 1049, 1051 (5th Cir.1997)). The *Burford*

abstention doctrine allows federal courts to dismiss a case only if it presents

> [D]ifficult questions of state law bearing on policy problems of substantial public import whose importance transcends the result in the case then at bar or if its adjudication in a federal forum would be disruptive of state efforts to establish a coherent policy with respect to a matter of substantial public concern.

*Quackenbush,* 517 U.S. at 707, 116 S.Ct. at 1716 (quoting *Colorado River,* 424 U.S. at 814, 96 S.Ct. at 1244-45).

Without doubt this lawsuit involves questions of substantial state concern. There is no question that bar admission is distinctly a matter in which Louisiana has substantial interests. Unarguably, the Louisiana Supreme Court has unique knowledge and familiarity with the considerations at stake when licensing lawyers.

■ Notwithstanding, Plaintiffs' claims do not involve the "difficult questions of state law" required for *Burford* abstention. Plaintiffs' claims are based solely on federal law. The meaning of Supreme Court Rule XVII is not at issue in this suit. The only issue is whether that rule is in conflict with various federal laws. Thus, the threshold requirement for *Burford* abstention is not present in this case.

Furthermore, Defendants' abstention argument is less persuasive given that many of Plaintiffs' federal arguments have already been presented to and rejected by the Louisiana Supreme Court. *See In re Bourke,* 819 So.2d 1020 (2002). At this time, there are no pending state court proceedings in which this Court need fear of interfering.

For the foregoing reasons the Court declines to exercise its discretion to abstain from this matter.

## III. Plaintiffs' Motion For Summary Judgment

Plaintiffs move for summary judgment on their claims for declaratory relief. They assert that all facts are contained in the pleadings and that none of the relevant facts are in dispute. Plaintiffs point out that because this action results from the unconstitutionality of Louisiana Supreme Court Rule XVII, Section 3(B), and the Rule's blanket application to non-immigrant aliens, it is clear that no facts exist which could be contentious or that might affect the result of the action. Plaintiffs assert that the record indicates that the only genuine issue is one of constitutionality, and therefore, the case is ripe for summary adjudication.[19]

### A. Legal Standards

In determining whether a party is entitled to summary judgment, the court views the evidence in the light most favorable to the non-moving party. *Littlefield v. Forney Indep. School Dist.*, 268 F.3d 275, 282 (5th Cir.2001) (citing *Smith v. Brenoettsy*, 158 F.3d 908, 911 (5th Cir.1998); *Tolson v. Avondale Indus., Inc.*, 141 F.3d 604, 608 (5th Cir.1998)). Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *Id.* (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). The moving party bears the burden, as an initial matter, of showing the district court that there is an absence of evidence to support the nonmoving party's case. *Id.* (citing *Celotex*, 477 U.S. at 325, 106 S.Ct. at 2548, 106 S.Ct. 2548). If the moving party fails to meet this initial burden, the motion must be denied regardless of the nonmoving party's response. *Id.*

### B. Constitutional Claims

 Notwithstanding the plenary power of the state's highest court to regulate the practice of law, a state cannot exclude a person from the practice of law for reasons that contravene the Due Process or Equal Protection Clauses of the Fourteenth Amendment. *See Schware v. Board of Bar Examiners*, 353 U.S. 232, 238–39, 77 S.Ct. 752, 756, 1 L.Ed.2d 796 (1957). Regardless of whether a state's grant of permission to practice law is a "right" or "privilege," a person cannot be prevented from practicing law except for valid reasons. *Id.* n. 5 (citing *Ex parte Garland*, 4 Wall. 333, 379, 18 L.Ed. 366 (1866)).

### 1. Due Process Claims

Plaintiffs assert that they were entitled to a hearing, the presentation of evidence to prove their allegations, and to the disclosure of whatever information and recommendations were presented to the Louisiana Supreme Court by the Louisiana State Bar Association Committee on Admissions. Plaintiffs assert that they were denied their due process rights when the Louisiana Supreme Court overruled its prior *jurisprudence constante* without giving Plaintiffs an opportunity to be heard.

Defendants argue that Plaintiffs do not state a claim for a procedural due process violation nor a substantive due process violation. Defendants point out that none of the Plaintiffs availed themselves of the state review procedures and therefore can claim no due process violation. Defen-

---

**19.** Defendants did not file a cross motion for summary judgment but filed a motion to dismiss instead. Defendants' arguments in opposition are taken from their motion to dismiss which Defendants have also designated as their opposition to Plaintiffs' motion for summary judgment. Rec. Doc. 19.

dants argue that a substantive due process claim only protects "fundamental rights" and that there exists no fundamental or constitutional right of a non-lawyer to practice law.

■ The Court has reviewed the authorities cited by Plaintiffs in support of their contention that they were denied due process of law and concludes that Plaintiffs fail to state a claim for a due process violation. While *Willner v. Committee on Character & Fitness,* 373 U.S. 96, 83 S.Ct. 1175, 10 L.Ed.2d 224 (1963), does require that a denial of an application to practice law must comport with principles of procedural due process, the case does nothing to support the contention that Leclerc, Jarry, Boulord, and Affleck have been denied procedural due process. *Willner* requires the state to inform an applicant of the reasons his application is being denied and to permit a hearing thereafter. *Id.* at 105, 83 S.Ct. at 1181. Affleck was given the specific reason for Defendants' refusal to consider her equivalency application. The Supreme Court rules expressly permitted her to petition the Louisiana Supreme Court and to request a hearing. *Willner* requires no more. Affleck cannot claim a procedural due process violation as a result of her own failure to pursue the state procedural remedies available to her. Given that Leclerc, Jarry, and Boulord made no attempt, prior to filing this law suit, to submit an application to the Committee, they clearly have no claim for a procedural due process violation.

Likewise, *Schware v. Board of Bar Examiners,* 353 U.S. 232, 77 S.Ct. 752, 1 L.Ed.2d 796 (1957), does not persuade the Court that Plaintiffs have stated a claim for a substantive due process violation. In *Schware,* the United States Supreme Court held that the state had impermissibly applied its moral fitness standards to exclude plaintiff from practicing law. *Id.* at 247, 77 S.Ct. at 760. The Court held that the state had deprived plaintiff of due process of law because the record was wholly insufficient to support the state's finding of bad moral character. *Id.*

■ In the instant case, Plaintiffs are mounting a facial challenge to Supreme Court Rule XVII. *Schware* does not provide Plaintiffs a cause of action for a substantive due process violation in conjunction with a facial challenge. Instead *Schware* would allow an applicant aggrieved of the state's bar admission process to mount a due process challenge based upon his *individual* situation. If Plaintiffs had hoped to make such a claim then their appropriate course of action would have been to pursue the state procedures for appeal and then to seek certiorari in the United States Supreme Court as Schware had done. Even if Plaintiffs had done so, the *Rooker-Feldman* doctrine would have precluded such a substantive due process claim brought as an original action in this Court.

In sum, Plaintiffs' complaint fails to state a claim for deprivation of due process. Accordingly, Defendants' motion to dismiss is GRANTED with respect to Plaintiffs' due process claims.[20]

---

**20.** Plaintiffs' various memoranda suggest that they were denied due process because the Louisiana Supreme Court reversed its prior stance on the residency issue without giving Plaintiffs an adequate explanation and prior notice of the court's intention. This contention is absurd.

Further, Plaintiffs complain that Defendants have never expressed publicly the reason for their change in policy regarding nonresident aliens. Rec. Doc. 12 at 9. It is clear

from Plaintiffs' original complaint in this Court as well as the *Royot, et al.* petition for certiorari filed with the United States Supreme Court that Plaintiffs believe that the Louisiana Supreme Court's sudden reversal on the alien issue was prompted by the participation of foreign lawyers in Louisiana death penalty cases. Even though the Court finds this allegation highly speculative and questionable, as explained in *Southern Christian Leadership Conference,* unpopular motivations

## 2. Equal Protection Claim

Plaintiffs argue that Rule XVII, Section 3(B) violates the equal protection clause. Plaintiffs assert that alienage is a suspect classification which triggers strict scrutiny for purposes of an equal protection challenge. Plaintiffs assert that Defendants have given no justification for Rule XVII much less one that could withstand strict scrutiny. Plaintiffs further contend that even under a lower level of scrutiny, Rule XVII cannot withstand attack. Plaintiffs assert that an individual's residency status is wholly unrelated to his or her character and therefore is not a permissible criterion for bar admission purposes. Plaintiffs assert that *In re Griffiths*, 413 U.S. 717, 93 S.Ct. 2851, 37 L.Ed.2d 910, (1973), clearly supports their claims.

Citing *Southern Christian Leadership Conference v. Supreme Court of Louisiana*, 252 F.3d 781, 786 (5th Cir.2001), Defendants contend that Plaintiffs have failed to state a claim for a constitutional violation because there is no fundamental right for a non-lawyer to practice law. Simply said, Plaintiffs have no constitutional right to sit for the Louisiana bar exam and this circuit consistently recognizes the plenary power of the Louisiana Supreme Court to regulate the practice of law.

Defendants argue that *In re Griffiths* is legally and factually dissimilar from this case and therefore does not support Plaintiffs' claims. Defendants assert that Louisiana's decision not to offer bar admission to those persons with truly temporary status, and who are therefore transient, falls within the valid and legitimate exercise of the State's public safety and police power.

■ While there may be no constitutional right for admission to a state's bar, admission policies and procedures (even if substantiated) do not transform a challenged rule "into an unconstitutional state action." 252 F.3d at 794–95.

cannot run afoul of the Equal Protection Clause. *See Schware v. Board of Bar Examiners*, 353 U.S. 232, 238–39, 77 S.Ct. 752, 756, 1 L.Ed.2d 796 (1957). The Equal Protection Clause of the Fourteenth Amendment directs that "all persons similarly circumstanced shall be treated alike." *Plyler v. Doe*, 457 U.S. 202, 216, 102 S.Ct. 2382, 2394, 72 L.Ed.2d 786 (1982) (quoting *F.S. Royster Guano Co. v. Virginia*, 253 U.S. 412, 415, 40 S.Ct. 560, 561, 64 L.Ed. 989 (1920)). However, "[t]he Constitution does not require things which are different in fact or opinion to be treated in law as if they were the same." *Id.* (alteration in original) (quoting *Tigner v. Texas*, 310 U.S. 141, 147, 60 S.Ct. 879, 882, 84 L.Ed. 1124 (1940)). Aliens are "persons" guaranteed equal protection of the laws. *Id.* at 210, 102 S.Ct. at 2391.

■ Well-established principles of constitutional law hold that classifications upon a suspect class or classifications that affect fundamental rights are subject to strict scrutiny review. *Hatten v. Rains*, 854 F.2d 687, 690 (5th Cir.1988) (citing *Massachusetts Bd. of Retirement v. Murgia*, 427 U.S. 307, 312, 96 S.Ct. 2562, 2566, 49 L.Ed.2d 520 (1976); *San Antonio School District v. Rodriguez*, 411 U.S. 1, 16, 93 S.Ct. 1278, 1287, 36 L.Ed.2d 16 (1973)). Such laws are presumptively invalid unless the state can demonstrate that the law is the least restrictive means to achieve a compelling state interest. *See id.; In re Griffiths*, 413 U.S. at 721, 93 S.Ct. at 2855. Rarely, if ever, will laws survive challenge at this level of scrutiny. *Bernal v. Fainter*, 467 U.S. 216, 220 n. 6, 104 S.Ct. 2312, 2316, 81 L.Ed.2d 175 (1984) ("As one commentator observed, strict-scrutiny review is 'strict' in theory but usually 'fatal' in fact.")

Finally, the Court fails to comprehend the relevance of other state bar admission rules to any of the legal issues in this case.

However, classifications which operate upon a quasi-suspect class are accorded intermediate scrutiny, and must bear a significant relationship to an important state end. *Id.* (citing *Kirchberg v. Feenstra*, 450 U.S. 455, 101 S.Ct. 1195, 67 L.Ed.2d 428 (1981)). All other classifications need only bear a rational relationship or basis to a legitimate legislative end. *Id.* (citing *City of Cleburne v. Cleburne Living Center*, 473 U.S. 432, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985)).

Hence, the threshold issue in any equal protection analysis is the level of scrutiny to be applied. The applicable level of scrutiny is of paramount importance to the parties because the level of scrutiny applied often serves as the bellwether of the statute's validity. Naturally then, Plaintiffs herein are arguing for strict scrutiny and Defendants, while not specifically addressing the appropriate level of scrutiny, have implicitly argued for rational basis review.[21]

Although the United States Supreme Court has repeatedly used strict scrutiny to invalidate state laws applying classifications based upon alienage, none of those cases involved temporary, non-resident aliens such as Plaintiffs herein.[22] Rather, in all cases where the Court applied strict scrutiny, the affected aliens were ***permanent resident*** aliens. *See, e.g., Bernal .v. Fainter*, 467 U.S. 216, 220 n. 6, 104 S.Ct. 2312, 2316, 81 L.Ed.2d 175 (1984) (invalidating a state law precluding permanent resident aliens from becoming notaries); *In re Griffiths*, 413 U.S. 717, 93 S.Ct. 2851, 37 L.Ed.2d 910 (1973) (invalidating a state law precluding permanent resident aliens admission to the state bar). Although the equal protection challenge in *Toll v. Moreno*, 458 U.S. 1, 102 S.Ct. 2977, 73 L.Ed.2d 563 (1982), involved a non-resident (non-immigrant) alien, the Court expressly declined to consider the case on equal protection grounds opting instead to strike the law based on preemption.[23]

However, in his dissenting opinion, then Justice Rehnquist discussed how the fundamental differences between permanent resident aliens and non-resident aliens should preclude the Court's ever applying strict scrutiny analysis where non-immigrants are involved. *Toll*, 458 U.S. at 25, 102 S.Ct. at 2990 (Rehnquist, J., dissenting). The crux of his argument was that resident aliens are so much like citizens that distinctions among them should be carefully scrutinized.[24] *Id.* at 45, 102 S.Ct.

---

**21.** Defendants assert that Rule XVII "falls within the valid and legitimate exercise of the State's public safety and police powers." Defendants' Motion to Dismiss at 17 n. 10. Such a justification is consistent with rational basis review. At oral argument, defense counsel confirmed Defendants' position that rational basis review should apply.

**22.** It is now widely accepted that federal laws creating classifications based upon alienage need only satisfy rational basis review. *Abreu v. Callahan*, 971 F.Supp. 799, 810 (S.D.N.Y. 1997) (citing *Mathews v. Diaz*, 426 U.S. 67, 96 S.Ct. 1883, 48 L.Ed.2d 478 (1976)). In other words, classifications among aliens that are wholly permissible for Congress to make are for the most part off limits to the states. *See Takahashi*, 334 U.S. at 418–19, 68 S.Ct. at 1142.

**23.** One commentator has suggested that the Court's choice of the preemption analysis in *Toll* was a product of the Court's hesitation to apply strict scrutiny to categories of non-resident aliens. Linda S. Bosniak, *Membership, Equality, & the Difference That Alienage Makes*, 69 N.Y.U. L.Rev. 1047, 1149 n. 251 (1994). The district court in *Toll* had applied strict scrutiny.

**24.** Even Justice Brennan, who authored the majority opinion in *Toll*, noted that "when Congress has done nothing more than permit a class of aliens to enter the country temporarily, the proper application of [the principles applicable to resident aliens] is likely to be a matter of some dispute." *Toll*, 458 U.S. at 13, 102 S.Ct. at 2984.

at 3000. Non-immigrant aliens, on the other hand, are sufficiently different from citizens and immigrant aliens in relevant respects that distinctions between them should not call for heightened scrutiny. *Id.* Since *Toll*, the Supreme Court has not yet decided the applicable level of scrutiny applicable to non-resident aliens. Lower court opinions have gone both ways without an in depth analysis as to why strict scrutiny was or was not applied. *See, e.g., Ahmed v. University of Toledo*, 664 F.Supp. 282 (N.D.Ohio 1986) (applying rational basis review); *Tayyari v. New Mexico State Univ.*, 495 F.Supp. 1365 (D.N.M. 1980) (applying strict scrutiny).

At oral argument, Plaintiffs' counsel argued that strict scrutiny should be expanded to include temporary non-resident aliens because there are no reasonable differences between resident and non-resident aliens. Therefore, Plaintiffs argued, all lawful aliens should comprise a suspect class.

Perhaps all lawful aliens should comprise a suspect class. However, the current state of the law is that the United States Supreme Court has not yet treated non-immigrant aliens as a suspect class. In *Toll* the Court had the opportunity but chose, not to do so. Instead the Court decided the case on much narrower grounds. Since the U.S. Supreme Court chose not to expand strict scrutiny status to non-immigrant aliens, this Court finds no basis to do so. The Supreme Court reluctantly creates new suspect classes because each new expansion involves the invalidation of virtually every classification bearing upon the newly created suspect class. *See Massachusetts Bd. of Retirement v. Murgia*, 427 U.S. 307, 318, 96 S.Ct. 2562, 2569, 49 L.Ed.2d 520 (1976) (Marshall, J., dissenting).

 Moreover, the Supreme Court's rationale for applying strict scrutiny to resident aliens was largely based on the compelling similarities between permanent resident aliens and citizens. *See Griffiths*, 413 U.S. at 722, 93 S.Ct. at 2855; *Nyquist v. Mauclet*, 432 U.S. 1, 12, 97 S.Ct. 2120, 2126–27, 53 L.Ed.2d 63 (1977). Given the similarities between citizens and resident aliens, state-based distinctions among them merit strict scrutiny. However, non-immigrant aliens differ from immigrant aliens and citizens in a fundamental respect—they are admitted to this country on a temporary basis and for limited purposes. Thus, this Court finds strict scrutiny to be inapplicable in this case.

The more difficult question is whether rational basis review should apply or perhaps some intermediate or heightened level of scrutiny that falls somewhere along the strict scrutiny/rational basis review extremes. The United States Supreme Court or even the Fifth Circuit might very well alight on some middle ground analysis given how solicitous the Supreme Court has been of protecting resident aliens. This Court, however, declines the invitation to create a new quasi-suspect class or foray into the "intermediate scrutiny thicket." The Court therefore opts for rational basis review.

Defendants argue that Rule XVII, Section 3(B) passes rational basis review because the Louisiana Supreme Court has a legitimate interest in insuring that litigants in the state's courts are represented not only by competent lawyers but by lawyers who are not subject to having their residency revoked on relatively short notice, or at best lawyers who are only in this country temporarily. Defendants point out not only the potential disruption to the courts' dockets but also the prejudice that clients could suffer if a lawyer is forced to leave the country in the midst of litigation or perhaps even a trial. Surely, both parties are aware that litigation can span years and might often times last longer

than the time Congress would allow a temporary alien to remain in the United States. A client's representation is therefore subject to disruption for reasons completely beyond the lawyer's control—reasons of which the client might very well be unaware when he retains counsel.

At oral argument, defense counsel pointed out the near impossibility of tracking down client files, evidence, etc. should a non-resident alien be forced to leave the United States on unfavorable and sudden terms. Counsel posited that the Louisiana Supreme Court would lack any type of disciplinary recourse against an alien lawyer once deported and outside of any state bar's jurisdiction.

 Unarguably, the Defendants' proffered reasons do satisfy rational basis review. Rule XVII, Section 3(B) is clearly related to Defendants' legitimate interest in insuring that litigants are represented by counsel who will be in this country when those litigants finally have their day in court. Consequently, Plaintiffs' motion for summary judgment is DENIED on the equal protection claim.

### C. Federal Preemption

Plaintiffs argue that Rule XVII is invalid because only the United States has the exclusive power to establish rules governing immigration, foreign policy, and the rights of non-citizens, and that this power is binding on the states by way of the Supremacy Clause.

 The authority to control immigration, that is to admit or exclude aliens, is vested solely in the federal government. *Takahashi v. Fish & Game Comm'n,* 334 U.S. 410, 416, 68 S.Ct. 1138, 1141, 92 L.Ed. 1478 (1948) (citing *Fong Yue Ting v. United States,* 149 U.S. 698, 713, 13 S.Ct. 1016, 1022, 37 L.Ed. 905, 913). The Constitution grants the states no authority over immigration matters. *Id.* at 419, 68 S.Ct. at 1142. Thus, state laws which impose "dis-criminatory burdens" upon the entrance or residence of aliens lawfully within the United States are in conflict with federal law and are therefore invalid. *Id.* In such a situation, the Supremacy Clause dictates that federal law must prevail. *See Toll v. Moreno,* 458 U.S. 1, 102 S.Ct. 2977, 73 L.Ed.2d 563 (1982); U.S. Const. art. VI, cl. 2.

 However, every state enactment which in any way deals with aliens is not necessarily a regulation of immigration and thus per se pre-empted by federal law. *DeCanas v. Bica,* 424 U.S. 351, 354, 96 S.Ct. 933, 936, 47 L.Ed.2d 43 (1976). In other words, "standing alone, the fact that aliens are the subject of a state statute does not render it a regulation of immigration." *Id.* A regulation of immigration is essentially a determination of who should or should not be admitted into the country, and the conditions under which a legal entrant may remain. *Id.* If the regulation or statute at issue does not regulate immigration, then the court will determine whether the regulation or statute conflicts with federal law. If no conflict exists, then there is no preemption. *Id.* at 356–58, 96 S.Ct. at 936–38. However, even where no direct conflict exists, state laws will be preempted where they "stand[ ] as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress in enacting the [immigrations laws]." *Id.* at 363, 96 S.Ct. at 940. Simply said, states have no power to "add to nor take from the conditions lawfully imposed by Congress upon admission, naturalization, and residence of aliens in the United States." *DeCanas,* 424 U.S. at 358 n. 6, 96 S.Ct. at 938.

In *Toll,* the Supreme Court invalidated Maryland's policy of denying non-immigrant aliens the ability to obtain "in-state" status for purposes of reduced tuition and fees. 458 U.S. at 10, 102 S.Ct. at 2982.

The state had argued that the higher fees were an appropriate measure to make up the Congressional tax breaks given to certain aliens. The Court concluded that Maryland's practice of charging higher tuition and fees to the non-immigrant aliens frustrated Congress's policy of giving state tax breaks to G–4 visa holders. *Id.* at 16, 102 S.Ct. at 2985–86. The Court was persuaded that a state could not recoup indirectly from the non-immigrants what the federal government had expressly barred the state from collecting. *Id.* The crux of the *Toll* holding is that a state cannot regulate aliens in such a way so as to deprive aliens of benefits and advantages that Congress specifically intended for those aliens to have while residing in this country.

Supreme Court Rule XVII, Section 3(B) has no arguable relevance or impact on who is admitted into the United States. Plaintiffs argue that the Rule is nevertheless a regulation of immigration because it regulates the conditions under which a legal entrant may remain in this country. Plaintiffs' argument is unpersuasive because it requires a far broader interpretation of "conditions under which an [alien] may remain" that what the Supreme Court's jurisprudence would allow. Under Plaintiffs' argument, any state law that affected aliens would be a regulation of immigration. However, the United States Supreme Court expressly rejected that suggestion in *DeCanas v. Bica, supra.* A more likely reading of "conditions under which an [alien] may remain" would be one encompassing laws that affect an alien's ability to remain in a specific jurisdiction. For instance, no state could enact a law requiring deportation based upon the alien's conduct within the state. Such a law would clearly be one setting conditions under which an alien could remain in the jurisdiction, and such a law would surely be invalid. Rule XVII does not set conditions under which an alien may remain in this country or this state and it is there-fore not a regulation of immigration subject to *per se* preemption.

Further, Plaintiffs cite no specific conflicts between Rule XVII and federal immigration law or Congressional policy. *Toll* and *DeCanas* demonstrate that Congress has not preempted the field of law applicable to aliens. Thus, absent a law being a regulation of immigration, a true conflict must exist between the challenged regulation and Congressional policy. At the very least, the challenged regulation must in some way frustrate Congress's policy regarding aliens in order for pre-emption to apply. Looking to the types of visas pursuant to which Plaintiffs reside in the United States, the Court can discern no such tension between Rule XVII and federal immigration law.

Leclerc, Jarry, and Boulard entered and remain in the United States pursuant to J–1 visas, also known as exchange visas.

> J-class aliens are those aliens having a residence in a foreign country which he has no intention of abandoning who is a bona fide student, scholar, trainee, teacher, professor, research assistant, specialist, or leader in a field of specialized knowledge or skill, or other person of similar description, who is coming temporarily to the United States as a participant in a program designated by the Director of the United States Information Agency, for the purpose of teaching, instructing or lecturing, studying, observing, conducting research, consulting, demonstrating special skills, or receiving training . . . .

8 U.S.C. § 1101(a)(15)(J).

Affleck entered and remains in the United States pursuant to an L–2 visa. An L–2 visa is issued to the spouse of an L–1 visa holder. Affleck's spouse is an L–1 class alien which is an alien

> who, within 3 years preceding the time of his application for admission into the

United States, has been employed continuously for one year by a firm or corporation ... and who seeks to enter the United States temporarily in order to continue to render his services to the same employer ... in a capacity that is managerial, executive, or involves specialized knowledge....

8 U.S.C. § 1101(a)(15)(L).

J-visas and L-visas are therefore temporary by design. At oral argument counsel informed the Court that J-visas usually entail an eighteen month or so stay in the United States. Affleck has a temporary Employment Authorization Document ("EAD") and has applied for a permanent one.

At oral argument, Plaintiffs argued that Rule XVII, Section 3(B) is inconsistent with the advantages Congress bestowed on them by virtue of their respective immigration visas. The Court disagrees given that the sole effect of Rule XVII upon Plaintiffs is that they cannot obtain licenses to practice law. Leclerc, Jarry, and Boulord can do everything enumerated in the definition of J-class aliens without a license to practice law. Moreover, the practice of law as a licensed attorney lacks congruency with the other teaching and research oriented aspects of J-classification. The inability to obtain a law license simply does not pose an obstacle to Plaintiffs' ability to obtain any of the benefits and advantages associated with having a J-visa. Consequently, federal preemption does not apply.

Affleck's situation presents a wholly uncompelling argument given that she is in the United States pursuant to a spousal L–2 visa. Again, preemption is not applicable.

*Takahashi v. Fish & Game Commission*, 334 U.S. 410, 68 S.Ct. 1138, 92 L.Ed. 1478 (1948), does not compel a different result. *Takahashi* invalidated on preemption grounds a provision of California law that banned the issuance of fishing licenses to "any person ineligible to citizenship." Takahashi was a resident alien [25] who had earned a living as a fisherman for nearly thirty years when California sought to exclude all aliens from obtaining fishing licenses. The Court began its analysis by explaining the vast differences in the ability of the federal and state governments to regulate alien activities—a principle that is now well-established in the law. *See* note 22 *supra*. In striking the California statute, the Court concluded that the state's attempt to prevent lawful aliens from earning a living was tantamount to expelling them because an alien cannot live where he cannot work.[26] *Id.* at 416–19, 68 S.Ct. at 1141–42 (quoting *Truax v. Raich*, 239 U.S. 33, 36 S.Ct. 7, 60 L.Ed. 131 (1915)).

In contrast, Rule XVII does not affect aliens who permanently reside in the United States. Rather, Rule XVII affects temporary aliens who are not in this country to pursue long term, life sustaining employment. Plaintiffs are permitted to earn a living; however, they cannot represent litigants as licensed attorneys at law. The concerns at issue in *Takahashi* are simply not present in this case.

█ Accordingly, Plaintiffs' motion for summary judgment is DENIED on the preemption issue.

---

**25.** At oral argument, Affleck asserted that Takahashi was a non-immigrant alien. The case is silent as to Takahashi's status but the Supreme Court mentioned in the opinion that Takahashi became a resident of California in 1907. The *Takahashi* decision was rendered in 1948. The Court seriously doubts that Takahashi was a non-immigrant alien.

**26.** *Takahashi* was also decided against the backdrop of racial discrimination targeted at persons of Japanese ancestry during and after World War II.

## D. Affleck's NAFTA Claim

Affleck asserts that she is in a special category of non-immigrant aliens in that she is a professional certified by a member of the North American Free Trade Agreement ("NAFTA"). Affleck asserts that Article 1202 of NAFTA requires that "service providers" be treated in a manner "no less favorable" than the treatment of local service providers "in the same circumstances." She asserts that Defendants' actions are a clear breach of that mandate. She argues that the spirit of NAFTA clearly directs the destruction of barriers to attorneys working in member states. Therefore, under the Supremacy Clause, Louisiana cannot make laws contrary to NAFTA.

In opposition, Defendants argue that Affleck's NAFTA claims are procedurally defective. NAFTA gives Affleck no private right of action against Defendants to force compliance with NAFTA. Defendants assert that NAFTA provides for enforcement by the Secretary of State and the Attorney General of the United States. Thus, Affleck lacks standing. Further, Affleck offers no support for her implicit assertion that NAFTA preempts the Eleventh Amendment or that NAFTA was meant to preempt well-established state authority over licensing of attorneys.

On December 17, 1992, the leaders of the United States, Mexico, and Canada completed and signed NAFTA. *Made in the USA Foundation v. United States of America,* 242 F.3d 1300, 1302–03 (11th Cir. 2001). On December 8, 1993, Congress passed the NAFTA Implementation Act which approved NAFTA and provided a series of domestic laws to effectuate and enforce NAFTA's provisions. *See* Pub.L. No. 103–182, 107 Stat.2057 (1993), codified at 19 U.S.C. §§ 3301–3473.

Section 102 of the Implementation Act is entitled "Relationship of the Agreement to United States and State Law." Section 102(b) ("Relationship of the Agreement to State law"), subpart (2) ("Legal Challenge"), provides:

No State law, or the application thereof, may be declared invalid as to any person or circumstance on the ground that the provision or application is inconsistent with the Agreement, *except in an action brought by the United States* for the purpose of declaring such law or application invalid.

19 U.S.C. § 3312(b)(2) (emphasis added).

Furthermore, subsection (c) ("Effect of the Agreement With Respect to Private Remedies"), provides:

*No person other than the United States-*

(1) shall have any cause of action or defense under—

(A) the Agreement or by virtue of Congressional approval thereof, or

\* \* \* \* \* \*

(2) may challenge, in any action brought under any provision of law, any action or inaction by ... any State ... on the ground that such action or inaction is inconsistent with the Agreement....

19 U.S.C. § 3312(c) (emphasis added).

 In light of the foregoing provisions of the NAFTA Implementation Act, the Court concludes that Affleck lacks standing to challenge Rule XVII based upon any purported conflict with NAFTA. Affleck's claim is an attempt to invalidate a state law due to its inconsistency with NAFTA. NAFTA's enabling legislation expressly limits such a legal challenge to the United States. The enabling legislation compels the conclusion that Affleck lacks standing to challenge Rule XVII based upon any purported conflict with NAFTA. Defendants' motion to dismiss is

GRANTED with respect to Affleck's NAFTA claim.

Accordingly;

**IT IS ORDERED** that Defendants' Motion to Dismiss (Rec.Doc. 18) should be and is hereby **DENIED IN PART AND GRANTED IN PART** as detailed in this Order and Reasons;

**IT IS FURTHER ORDERED** that the Motion for Summary Judgment (Rec. Doc. 12) filed by plaintiffs Karen Leclerc, Guillaume Jarry, Beatrice Boulord, and Maureen Affleck. should be and is hereby **DENIED** and Plaintiffs' complaint is **DISMISSED WITH PREJUDICE;**

**IT IS FURTHER ORDERED** that Plaintiffs' Appeal of the Order of the Magistrate Judge Granting a Protective Order and Staying All Discovery (Rec. Doc. 25) should be and is hereby **DENIED AS MOOT.**